UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| Marc J. Findsen and Beth K. Findsen, ) ) ) | |
| Plaintiffs, ) ) | CV-12-2349-PHX-SMM |
| vs. ) ) | Phoenix, Arizona September 23, 2013 |
| Tiffany & Bosco, P.A., ) ) | 2:27 p.m. |
| Defendant. ) ) ) | |

_____)

BEFORE:  THE HONORABLE STEPHEN M. MCNAMEE, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

RULE 16 SCHEDULING CONFERENCE


APPEARANCES:
For the Plaintiffs:
            Law Office of Beth K. Findsen
            By:  BETH K. FINDSEN, ESQ.
            7279 East Adobe Drive, Suite 120
            Scottsdale, AZ  85255

For the Defendant:
            Osborn Maledon
            By: WILLIAM J. MALEDON, ESQ.
                CHELSEA SAGE DURKIN, ESQ.
            P.O. Box 36379
            Phoenix, AZ  85067

Official Court Reporter:
Linda Schroeder, RDR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 32
Phoenix, Arizona  85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1          THE CLERK:  Civil case 12-2349, Marc Findsen and Beth

2     Findsen versus Tiffany & Bosco.  This is the time set for

3     scheduling conference.  Please announce your presence for the

4     record.

5          MS. FINDSEN:  Good afternoon.  I'm Beth Findsen here

6     for Beth and Marc Findsen.

7          THE COURT:  Thank you.

8          MR. MALEDON:  Good afternoon, Your Honor.  Bill

9     Maledon and Chelsea Durkin on behalf of the defendant

10    Tiffany & Bosco, and with me in the courtroom is Michael Bosco

11    and David Cowles from the Tiffany & Bosco law firm.

12         THE COURT:  Thank you very much.

13         Well, when we last were together, we recessed to see

14    if you could find your way to a solution in this case.  You

15    have not.  So now we're going to put the accelerator down and

16    see where we go.  I have a couple questions first of all.

17         One, why would PNC have referred the matter for

18    non-judicial foreclosure to Tiffany & Bosco if the plaintiffs

19    weren't in default?  Would they just do that because they

20    wanted to?  I don't get that.

21         MS. FINDSEN:  Because PNC is obscuring who they are.

22         THE COURT:  No, that's not my question, Ms. Findsen.

23         MS. FINDSEN:  Well, they want to foreclose.

24         THE COURT:  Well, I'm asking you would they have done

25    that if in fact there wasn't a default in the mortgage

1  payments?

2          MS. FINDSEN:  Sometimes they do.

3          THE COURT:  That's not, you know, that's not my

4  question.  You keep sidestepping my question, Ms. Findsen.  My

5  question is very simple.

6          MS. FINDSEN:  I don't understand the question.

7          THE COURT:  Why, if you're a law firm and you get

8  documents in and you're allowed to rely on those documents, why

9  would they send out notice of judicial foreclosures if they did

10  not have reason to believe in the documents that the plaintiff

11  or whoever the noteholder -- not the noteholder -- but those

12  who are obligated under the note were not in default?

13          MS. FINDSEN:  I would say they considered it to be in

14  default.  Default is a legal conclusion, and I would say that

15  PNC had already shown a willingness to foreclose.

16          THE COURT:  Be careful, because we're starting to get

17  into speculation.

18          Mr. Maledon and Ms. Durkin, give me your perspective

19  on this.

20          MR. MALEDON:  Well, Your Honor, quite frankly, they

21  wouldn't have done that if there had not been a default, and

22  indeed there was a default.  I don't think that's in dispute.

23  The payments had not been made since June of 2010 and still

24  have not been made since June of 2010.  The Findsens have lived

25  in the home for some three-plus years without making any

1  mortgage payments and have strung this out.  So the answer to

2  Your Honor's question is that PNC would not have done that.

3  PNC, as Your Honor knows, is the servicer on the mortgage.

4  They're the ones to whom the Findsens had made their payments

5  previously.  They knew who to make their payments to.  And if

6  they had not stopped making payments, there would not have been

7  a foreclosure proceeding initiated.

8          THE COURT:  Well, let me ask you this, Mr. Maledon.

9  If there's been a default and even though we have this lawsuit

10  and ostensibly it's under the Fair Debt Collection Act, why

11  over a period of years wasn't the foreclosure just gone forward

12  with in a non-judicial fashion?

13          MR. MALEDON:  Well, Your Honor, that's a complicated

14  question to answer, but the long -- the short answer to Your

15  Honor's question is because of the pendency of this lawsuit and

16  because of the pendency of two other lawsuits.

17          THE COURT:  Which have been dismissed, as I understand

18  it.

19          MR. MALEDON:  They have both been dismissed, but it

20  took some time.  Because of the pendency of those lawsuits, and

21  we were the third ones to be sued, we being Tiffany & Bosco,

22  and because of the pendency of those lawsuits, PNC decided --

23  and I don't want to get into legal advice or whatever, Your

24  Honor -- but I would just tell you that PNC decided not to

25  proceed with the foreclosure until the lawsuits had been

1      resolved.

2           THE COURT:  I understand.  Okay.  Thank you.  Next

3      question I have is assuming for the moment that the plaintiffs

4      are in a dispute with PNC, whatever the dispute is, what I

5      don't understand is what difference does it make who owned the

6      title to the property that PNC was the agent for?  It doesn't

7      make any difference.  Because the plaintiffs are locked in with

8      their rights and remedies and responsibilities and liabilities

9      under the documents of the case, no matter who they're assigned

10     to.  You're set in concrete at that moment.  The same way with

11     the defendants.  Despite before Tiffany & Bosco ever get

12     involved and, whoever, PNC is the servicer or Fly By Night,

13     Inc., is the servicer, your rights and remedies are locked in

14     at that time no matter who the note is ultimately assigned to.

15     And in that era of tumultuous activities, notes were assigned

16     almost on a daily basis.

17          So it doesn't make any difference who -- that you're

18     raising -- who is holder of the note or the mortgage documents.

19     Your rights are set, aren't they, Ms. Findsen?

20          MS. FINDSEN:  No, they're not set at all, because the

21     note and deed of trust themselves govern that transaction, and

22     they speak to specific parties, and they have continuing

23     obligations after the lending of the money.

24          It doesn't just stop there.  There's a Paragraph 22

25     that refers to lender.  They say loan servicer when they mean

1    loan servicer.  And when one wants to pay off a note, it says

2    if you want to make a prepayment, you must notify the

3    noteholder in writing.  And there is not a word about a

4    servicer in that entire document.

5         Also you're presupposing that PNC is a valid agent for

6    whomever it is that owns our note.

7         And then finally I would just say, as to the FDCPA,

8    all of that is irrelevant because the FDCPA is a statute that

9    protects debtors.  It's assumed you owe something to somebody

10   maybe, but that doesn't mean that you can come collect in any

11   kind of abusive way.

12        THE COURT:  No.  I understand that part.  But I'm

13   still saying that if someone holds the notes and you owe that,

14   if you make a prepayment under the note, you have rights and

15   remedies if they didn't do it the correct way.

16        But to just withhold -- What gives you the right, as I

17   understand it, to withhold your payments?

18        MS. FINDSEN:  We didn't withhold payments.  They sent

19   back our last check actually.  PNC sent back our last check.

20   So I'm glad you mentioned that, because I wanted to clarify

21   that from earlier.  We didn't stop payment.  They stopped our

22   payment.  They didn't accept our payment.

23        And since PNC isn't here, we can't ask them what

24   that's about.  And the two prior lawsuits were one count title

25   to find out something.  They were not claims for damages.  And

1    when we found out what we wanted to find out, they were

2    dismissed.  It wasn't some long course of obstruction or

3    stalling like they make it sound.

4            THE COURT:  Thank you.  Mr. Maledon or Ms. Durkin.

5            MR. MALEDON:  Well, Your Honor, with respect to the

6    statement by Ms. Findsen that PNC returned the payment, they

7    returned the payment -- and this was back in June of 2010 --

8    they returned the payment with an explanation that it was the

9    wrong amount, and here's the correct amount, they said.

10           And of course the correct amount was never paid.  It

11   was a difference of a few hundred dollars, if I'm recalling it

12   correctly.  So that's what she's referring to.

13           To answer Your Honor's question, PNC was the servicer

14   of the loan.  They're the ones to whom the Findsens made their

15   payments previously.  There's no reason whatsoever why they

16   couldn't, if they wanted to, continue to make the payments to

17   PNC.  They never questioned PNC's status as the servicer

18   before.  They never questioned whether or not their loan

19   payments had been properly credited.  They always had been.

20           So this notion that we didn't know who to make our

21   payments too, Your Honor, I respectfully submit, is just

22   nonsense.  Of course they knew who to make the payments to.

23   And moreover, Your Honor, they asked repeatedly for the name of

24   the noteholder.  They were given that.  They were given that

25   years ago.  And in fact we gave it to them again last Friday.

1    They've had it repeatedly.  And that's the name of a long

2    trust.  And, Your Honor --

3              THE COURT:  That buys those things?

4              MR. MALEDON:  Correct.  In other words, Your Honor,

5    the noteholder is a trust that is probably composed of whoever

6    invested in that particular debenture.  And PNC is the servicer

7    for the trust.

8              They've known that for a long, long time, Your Honor.

9    So this notion that they didn't know who to make their payments

10   to simply doesn't factually line up.

11             THE COURT:  What about the documents, Mr. Maledon, as

12   she has suggested, as Ms. Findsen has suggested, that the

13   documents are unclear?  Do you take the same position that

14   there's some ambiguity in the documents, or were the rights and

15   liabilities of the parties established in those documents when

16   the parties signed off on them?

17             MR. MALEDON:  Your Honor, we don't perceive any

18   ambiguity in the documents.  They lived under the documents

19   before.  It was only when they started filing these lawsuits

20   three years ago to avoid making their mortgage payments that

21   they trumped up these ambiguities in the documents.  We don't

22   think there's any ambiguity whatsoever.  And, Your Honor, PNC

23   is simply the agent for the noteholder.  They know that.  They

24   found that out when they sued PNC and they sued a previous

25   entity, Credit Suisse, in an effort to avoid the same

1    obligations before.  And now they've sued Tiffany & Bosco in

2    connection with Tiffany & Bosco's efforts to foreclose on

3    behalf of PNC.

4         So we don't think there's any ambiguity.  We think

5    that that's just something that they've parsed out of the

6    documents, if you will, but we don't believe there's any

7    ambiguity.

8         THE COURT:  Now, next question is -- Please, make

9    yourself comfortable.

10        The other thing is, Ms. Findsen, in your papers that

11   you filed here and the issues I've heard before, you have

12   raised the issue of you wanted to pre-pay the loan and that you

13   were inhibited from doing that because you didn't know who the

14   noteholder was.  And we'll get to that.  That will be a factual

15   question as to when you learned that and if you learned that

16   and what difference if anything it makes.

17        But the issue you raise by saying we're in a position

18   to pay off the note and mortgage financially, you have placed

19   your finances at issue in this case, particularly back then.

20        So you're going to have to produce a lot of that.  And

21   whether we do it under the -- some sort of a protective

22   agreement or not, I think you've placed those in there.  And if

23   we were to get into a discovery dispute over that, absent some

24   new revelation by you, you have put those in play, and they're

25   entitled to know that.

1        My question now to Mr. Maledon is if in fact, as

2   you've suggested in your case management plan, that the law is

3   clear as a matter of law that your client was operating not as

4   a debt collector but as a non-judicial foreclosure group, why

5   wasn't an early motion for summary judgment or judgment on the

6   pleadings considered or filed?

7        It may be strategic, but I was just kind of curious,

8   because in your moving papers you made a big point of that.

9        Go ahead.

10       MR. MALEDON:  Your Honor, there was a motion to

11  dismiss that was filed early on.

12       THE COURT:  Not a motion to dismiss.  Motion for

13  summary judgment.

14       MR. MALEDON:  Yes.  And, Your Honor, we did say in the

15  case management report that we would file a motion for summary

16  judgment.  And the reason, to answer Your Honor's question,

17  that we didn't do so as of today is that consistent with Your

18  Honor's direction at the last status conference that I was not

19  at but Ms. Durkin was, she came back and dutifully told me that

20  Your Honor thought that this case should be settled.  And we

21  thought it should be settled, Your Honor.

22       This is, in our view, absurd that this law firm is

23  going through this when they sent out one letter and left a

24  line inadvertently blank in it.  That's what started all of

25  this.  We have tried mightily to settle this case, Your Honor,

1     but it has morphed into much more than just an FDCPA case.

2          You know, we've -- Believe me, Your Honor, we have

3     tried mightily to settle it.  So that's why we didn't file it.

4     But, believe me, we will very shortly, Your Honor.

5          THE COURT:  I stand corrected then.  Okay.  I was the

6     one that created that mess, so I apologize to all of you, to

7     try and get you to settle it.  My fault.  Okay.

8          All right.  Well, we'll start with the Rule 16.  But,

9     again, I come back to this is going to be very, very expensive

10    at the end of the day for a lot of reasons.

11         One, the cost to both clients as far as your legal

12    costs go.

13         Two, there may come a point where you're going to have

14    to pay all the arrearages at some point.  And I don't know

15    if -- Because if it comes out that, as the plaintiffs suggest,

16    that this is a Fair Debt Collection Act, and if for some reason

17    you get limited to $1,000 in damages at the most, it will have

18    consequences past that.

19         And it's going to come into play, I think, when you

20    were first made aware of who the overall noteholder was and

21    whether that would make any difference whatsoever.  But it does

22    go to your knowledge and intent of the pursuit of this case

23    that we may have to deal with down the road.  So I just throw

24    those things out for the what-it's-worth category, because it's

25    going to be very expensive.

1          Now we'll get started.  I've looked at your case

2   management plan.  I take it you're not going to amend the

3   complaint or seek to amend the complaint; is that correct,

4   Ms. Findsen?

5          MS. FINDSEN:  Pardon?

6          THE COURT:  I take it that you're not going to seek to

7   amend your complaint?

8          MS. FINDSEN:  Actually I was, to leave off a deadline.

9   I was going to try to amend my complaint to add a claim under

10  33-420, the statute for false recordings.  It's in the --

11         THE COURT:  Wait, wait, wait.

12         MS. FINDSEN:  -- case management report.

13         THE COURT:  Well, the question is -- Maybe I missed

14  that part of it.

15         MS. FINDSEN:  Page 11, Lines 22 to 24.

16         THE COURT:  Page 11.  I'm sorry.

17         I'm sorry.  And what is the claim?  I'm looking at

18  Page 11 of the case management plan.  What line is it?

19         MS. FINDSEN:  22 to 24.

20         THE COURT:  Maybe I'm looking at the wrong one here,

21  but the case management plan I have was filed September the

22  16th, on Page 11, Line 22 to 24.

23         MS. FINDSEN:  I'm sorry.  I may have a different

24  version.  But it's under number seven.

25         THE COURT:  Number seven.

1          MS. FINDSEN:  The second paragraph, last sentence.

2          THE COURT:  Plaintiffs seek to file a cross-motion for

3     summary judgment?

4          MS. FINDSEN:  Correct.

5          THE COURT:  That's summary judgment.  That's not an

6     amendment to the --

7          MS. FINDSEN:  Right.  The second sentence.

8          THE COURT:  Mr. Maledon, what's your position on that?

9          MR. MALEDON:  Well, Your Honor, as I said, we thought

10    this was a simple FDCPA case.  I guess I'll have to see the

11    motion for leave to amend the complaint.  But I think, Your

12    Honor, we're going to end up taking the position it's not

13    proper to add those kind of claims, whatever they are, to a

14    relatively simple FDCPA case.  But Your Honor will have to

15    determine that eventually.

16         THE COURT:  All right.  Then what I will do is you can

17    file a motion to amend no later than October the 4th, and an

18    answer should be filed no later than what the rules require.

19         And when I say an answer, or opposition to the

20    amendment, because you may have a purposeful opposition that

21    doesn't require an answer.  So then we'll decide it.

22         Next is you wanted fact discovery to be completed by

23    December the 20th.  Is that still a good date, Ms. Findsen?

24         MS. FINDSEN:  On my version we had changed it to

25    January 24th, 2014, the second case management report.

1          THE COURT:  Either I've got something out of place

2     here or -- I'm sorry.  You do have that on there.  I must have

3     an old -- Oh, I know what the problem is.  It's a different

4     document.  I'm sorry.  My apologies to you both.

5          Okay.  Here we go.  January 24th, is that still a good

6     date?

7          MS. FINDSEN:  Yes.

8          MR. MALEDON:  That's fine, Your Honor.

9          THE COURT:  Now, backing into experts, you have expert

10    disclosures January 10th and February 14th.  Are we

11    anticipating any disclosures, fact disclosures, somewhere

12    between the 10th and 24th that would cause an expert to have to

13    amend their report or anything like that?  Because then we have

14    to do it all over again.

15         MS. FINDSEN:  Right.

16         THE COURT:  Normally what I do is I do expert

17    disclosures after the facts are done so there's no surprises.

18         MS. FINDSEN:  Right.

19         THE COURT:  So we can move that into just exchange one

20    date like February 14th and then 30 days after that for the

21    defense.

22         MS. FINDSEN:  Okay.

23         THE COURT:  Is that okay?

24         MR. MALEDON:  That's fine, Your Honor.

25         THE COURT:  Okay.  Let me put that in here.

1          Okay.  That would be -- Is March the 14th okay, or do

2    you want March 21st?

3          MR. MALEDON:  14th is fine, Your Honor.

4          THE COURT:  And then any rebuttal, if any, would be

5    due April the 11th.  So we missed two historic dates by one.

6          So, Ms. Findsen, your expert reports will be due to

7    them on Valentine's Day.  And unfortunately they missed by one

8    day referring theirs back to you on the Ides of March.

9          MS. FINDSEN:  Which is my birthday.

10         THE COURT:  You'll get a birthday gift.

11         MS. FINDSEN:  No, thank you.

12         THE COURT:  Okay.  Now, we're talking now about the

13   number of depositions, and I don't -- You know, ten is normally

14   the limit.  You're not expecting more than that, are you?

15         MR. MALEDON:  Certainly not defendants, no, Your

16   Honor.

17         MS. FINDSEN:  No.

18         THE COURT:  What about the time to conduct all of

19   this?  Under Arizona rules it's four hours.  Do we need more

20   time than that for the parties or not?

21         MR. MALEDON:  We do not believe so, Your Honor, no.

22         MS. FINDSEN:  I don't believe so either.

23         THE COURT:  Four hours it is.

24         Interrogatories, 25 at the most?

25         MS. FINDSEN:  Yes.

1          MR. MALEDON:  That's fine, Your Honor.

2          THE COURT:  And what about requests for admissions?

3     We haven't been using very many of those lately, but sometimes

4     they are important.  So I usually go 20 each side.

5          MR. MALEDON:  That's fine, Your Honor.

6          THE COURT:  There's something in here about deadline

7     for engaging in full faith settlement clause, and this got

8     picked up from another judge.

9          My feeling is that if people are engaging in

10    settlement negotiations, that's personal, because I don't think

11    you can put a deadline on what is good faith settlement

12    negotiations.  So I've always taken the position that if the

13    parties want to settle the case, they know how to settle the

14    case.

15         If you want some help, we'll give you a

16    magistrate judge for free.  If you don't want one of them and

17    want to go outside and hire someone privately, be my guest.

18    There's lots of them out there who are doing that kind of work.

19    And if you want to pay the arm and a leg to do that, that's

20    fine.

21         Go ahead, Mr. Maledon.

22         MR. MALEDON:  Thank you, Your Honor.  Your Honor, you

23    mentioned settlement, so I thought I would stand up and

24    reiterate again that Tiffany & Bosco would like to settle this

25    case.  They would like to have it behind them.  And we've tried

1   to do so and have been unsuccessful.  So we would welcome the

2   opportunity for Your Honor to appoint a magistrate judge.  I

3   don't think it would take very long.  The issues in this case

4   we don't think are very complex.

5         But unfortunately the damages have morphed into

6   something that is almost unrecognizable, in our view, under an

7   FDCPA case.  So we think the intervention of a magistrate judge

8   in an effort to try and settle this might be beneficial.  And

9   we would ask that that be done relatively soon even before we

10   file our motion for summary judgment so that if it can be

11   settled, we don't have to waste Your Honor's time or the time

12   of counsel and the parties.

13         THE COURT:  Ms. Findsen, what's your position?

14   Because I don't -- I'm willing to do that.  What I don't want

15   to do is appoint a magistrate judge, the parties come in,

16   nothing happens, and we get nowhere.  We've wasted everyone's

17   time.  But if you want one, I'll work it out.  But if you

18   don't --

19         MS. FINDSEN:  We've always been willing to settle and

20   have engaged in good faith settlement talks throughout, so, no,

21   I have no objection to a magistrate.

22         THE COURT:  Now, do you want to do that prior to them

23   filing a motion for summary judgment?

24         MS. FINDSEN:  Sure.

25         THE COURT:  Okay.  Then let's -- We'll make a separate

1  note to settle -- We'll put one on the board a little bit.  It

2  depends on how soon we can get someone.  That's the problem.

3  Sometimes they're a little busier than most.  But I would

4  suggest we can get one within the next three weeks, two or

5  three weeks, I would gather.  Is that too soon?

6          MR. MALEDON:  No.  I think that would be fine for us,

7  Your Honor.

8          MS. FINDSEN:  Fine for us as well.

9          THE COURT:  Okay.  Then let's see what we can do about

10  getting someone.

11          I won't hold back discovery, though, while this is

12  going on, because I think there's enough flex time in your

13  schedule to accommodate this, however.

14          And then dispositive motions would be due -- You can

15  certainly file them before that.  Let me just look at this.

16  Would summary judgment on some of these issues be fact

17  determinative requiring an expert to weigh in, or is this just

18  straight matters of law?

19          MR. MALEDON:  We don't believe our motion for summary

20  judgment would require any expert involvement, Your Honor.

21          THE COURT:  Ms. Findsen.

22          MS. FINDSEN:  Only as to damages.

23          THE COURT:  Pardon?

24          MS. FINDSEN:  Only as to damages might an expert be

25  required.

1    THE COURT:  Experts are very expensive.  If you're

2  talking about an expert on damages, it makes me question about,

3  if this is a simple case, how simple the issues are in reality,

4  because the damage, as Mr. Maledon says, from his perspective,

5  have morphed into something that's unrecognizable from their

6  point of view.  You've sued under a very narrow statute.  And

7  how you're going to get those other damages, I'm not quite sure

8  of.  But be that as it may, that may be an impediment to filing

9  all these things.

10    So we'll put down at least right now --

11    MS. FINDSEN:  It likely won't be needed, but actual

12  damages are allowed by the statute.  I think the damages are

13  pretty simple.  There's a difference between an amount quoted

14  then and an amount quoted now of late charges that arose on the

15  loan.

16    THE COURT:  Well, we'll see about that, because those

17  have been accumulating for three years, and those have been

18  compounded.

19    MS. FINDSEN:  No.  We were writing letters for six

20  months prior to October -- We're talking about from October of

21  2011 and just as to Tiffany & Bosco.

22    So we were paying, until they rejected our payment,

23  through most of that period, and then --

24    THE COURT:  Well, I understand that.  You keep saying

25  they rejected.  We all pay bills.  And sometimes we send in

1  checks or we send something in for a wrong amount.  It does

2  happen.  We write a check.  We're thinking about something

3  else.  We sign the wrong or different things.  They send them

4  back.  Most people say, sorry, here's the right amount.

5         So you're going to have a problem along those lines.

6  But if you think it can be resolved, I'll give you that.  But

7  February the 7th would be the date for summary judgment.  This

8  is the last time.

9         Now, the reason I bring this up is when you engage

10  someone for expert reports, that's very expensive, and they

11  want to be paid, and you have to pay them.  I don't care who it

12  is, either side.  You've used experts before if you're an

13  attorney, and you know what kind of bills they send you.  And

14  they can make your eyes spin.  That means each side is going to

15  be out of pocket for that amount of money.

16         So think about that one.  And that might be another

17  reason to try and settle this case early.

18         And, finally, our final pretrial conference, in

19  theory, if we don't get past all of this, when in May can we do

20  this?

21         THE CLERK:  In May?

22         THE COURT:  Yes.

23         THE CLERK:  Monday, May 12th, at 2:30, 2014.

24         THE COURT:  Okay.  If we have to come back here and

25  I've ruled on all the motions for summary judgment and we're

1    going to go to trial, we'll set a pretrial conference on May

2    12th, 2014.  And at that time we'll pick out a trial date which

3    is convenient for the Findsens and convenient for the attorneys

4    for Osborn Maledon with their trial schedules as well as some

5    of the witnesses.

6          But once we set that trial date, absent something

7    extraordinary, we go to trial.  I don't move these for hardly

8    any reason.  And I don't appreciate cases settling on the

9    courthouse steps, because we have too much business in here

10   that people need court time.

11         So for that, if I give you a definite date, I expect

12   all the witnesses to be here and be available.  If you're going

13   to have any out-of-state witnesses or anything else that are

14   going to cause trouble, please advise.  If you're going to use

15   your experts for damages or whatever, you will need to have

16   them available.  And experts don't like to be made available.

17   They want to do it by appointment only.  But they have to be in

18   this courtroom when it's time for them to testify.  If they're

19   not here -- that comes under my heading of too bad/so sad --

20   they're out of the case.  So please make them understand that.

21   It's not like state court where you just ride the calendar

22   forever and ever, and everybody's scrambling to get your

23   witnesses in the courtroom.

24         This is important to both sides.  I do all my own

25   discovery disputes myself, as you know.  Don't file anything

1    unless you meet and confer, and we'll get on the phone to take

2    care of things.  If we can't, we'll come to court.  But I don't

3    farm those out to anyone.

4         With that being said, it's up to you now to decide if

5    you -- because I ruled that your finances are in play now,

6    particularly as it relates to damages and your ability to make

7    those payments as you have suggested and as you have advocated

8    that you had the money in the bank and still have the money in

9    the bank to go forward.

10        MS. FINDSEN:  We did produce documents of bank

11   statements at the time that -- the time that is relevant that

12   show that we did in fact have more than the amount of the

13   entire note, not that we had said we were specifically going to

14   pay the whole note or part of the note or what we were going to

15   do.  But we have provided that, and I would like to know if

16   there's going to be any protection for this entire three-year

17   period that they're trying to open up or if you're saying no.

18        THE COURT:  It depends on what's relevant.  You placed

19   certain times in relevancy.  As for the rest of the three

20   years, I don't know.

21        Mr. Maledon, what's your point on that one?

22        MR. MALEDON:  Your Honor --

23        THE COURT:  Because that might be a little burdensome.

24   But go ahead.

25        MR. MALEDON:  -- the letter that Tiffany & Bosco sent

UNITED STATES DISTRICT COURT

1    was in October of 2011, roughly two years ago.

2         What they gave us was two pages of a securities sheet

3    from October 31, 2011, purporting to show what they had in that

4    particular account.  And that's what they want to limit us to

5    in terms of discovery.  We don't think that's sufficient.

6         They claim, Your Honor, that they have somehow been

7    prevented from October of 2011 up to the present time from

8    paying off their mortgage, which they say they wanted to do.

9    So we're at least entitled to discovery, I submit, Your Honor,

10   during that two-year period of time from October of 2011 up to

11   the present time.

12        So that we can -- And it's only because of this damage

13   claim that they're making, Your Honor, that Tiffany & Bosco is

14   supposedly responsible for all of the arrearages that have

15   occurred in the last two years as a result of this one letter

16   that they sent in October of 2011.  We don't quite understand

17   that.  I guess we'll figure that out in the course of

18   discovery.  But it seems to me that we're certainly entitled to

19   discovery during that two-year period of time.

20        THE COURT:  Thank you.  Ms. Findsen.

21        MS. FINDSEN:  Yes.  I just wanted to note that there

22   were -- there was more than one letter after the T&B letter

23   that they're talking about where they continued to try to

24   collect, and they did not give the name of the noteholder at

25   any time continuing through this date.  But they say:  If

1    you're not prepared -- this is their letter dated December

2    16 -- if you're not prepared to tender the full reinstatement

3    amount today, then the amount that you owe may increase between

4    the date of this letter and the date you reinstate the loan.

5          And then they go on:  This will increase because of

6    additional interest and late charges as well as legal fees and

7    costs that are incurred as additional steps in the foreclosure

8    proceed.

9          THE COURT:  I guess maybe I'm not as sophisticated as

10   everyone else is, but aren't there consequences, if you're in

11   default and the note's in default, isn't that a statement of

12   common sense that if you don't pay it, it's only going to keep

13   getting worse?

14         MR. FINDSEN:  Your Honor, first off, I'd like to go

15   back one second to PNC and the first question you asked.  The

16   reason why they put you in default, the second you're put in

17   default, PNC makes a ton more money.  And the second they

18   foreclose, they get that off the top.  So they want you in

19   default, believe me.

20         THE COURT:  Why should I believe you?

21         MR. FINDSEN:  Well, because I've been watching this

22   for four or five years, and I've watched their activities,

23   but -- Don't believe me.  Either way, Your Honor --

24         THE COURT:  People say trust me, accept me, believe

25   me, and --

1          MR. FINDSEN:  I understand.

2          THE COURT:  On what basis would I do that?  I --

3          MR. FINDSEN:  We have overwhelming evidence that we

4     can show you, Your Honor, that they're not the noteholder.

5          THE COURT:  And don't interrupt me, by the way.

6          MR. FINDSEN:  Sorry.

7          THE COURT:  So if you have evidence, I'll be happy to

8     listen to your evidence.  But you're just advocating at this

9     point.  And if that's a perspective of why it is, I appreciate

10    that.  But believability depends on the witness stand.  So I

11    want everybody to understand that.  It's nothing personal,

12    Mr. Findsen.  It's just that's the way it is.  But I get this

13    all the time in the courtroom.

14         MR. FINDSEN:  Sir, I was just trying to make -- follow

15    up on that first question.  The second one, the one that's more

16    important that we're talking about is the time frame after I

17    was willing and Beth was willing to pay the mortgage was in

18    2011.  We wouldn't have any charges after that if not -- if

19    they would have given us the correct creditor.  So our finances

20    after that time frame are completely irrelevant for an FDCPA

21    claim.

22         THE COURT:  Okay.  Now, why is it, just

23    hypothetically, if you take my premise that when the check was

24    sent in -- And, you know, unless you renegotiate, these

25    payments are the same every month unless there's an additional

1    charge for escrow fees or whatever it is, and usually those are

2    a supplemental note at the end of the year saying, by the way,

3    you owe me X dollars more.  But if it's the same every month --

4    And were you writing the checks personally, or were they

5    automatically taken out of your account?

6            MR. FINDSEN:  I think both, Your Honor.  It depended

7    on the time frame.

8            THE COURT:  Well, 2011, where the problem came in.

9            MS. FINDSEN:  I think they had been, and then they

10   changed it.

11           MR. FINDSEN:  Actually National City was --

12           MS. FINDSEN:  We only paid National City.

13           MR. FINDSEN:  Never once did I write a check to PNC,

14   first of all, never once.

15           THE COURT:  Okay.  If they were taking it out of your

16   account automatically --

17           MR. FINDSEN:  I think we were writing checks.

18           THE COURT:  -- was there some glitch there that they

19   took out a different amount?

20           MS. FINDSEN:  They did.  We had an escrow dispute, and

21   we have evidence of that in writing, and we've produced that,

22   that documentation, to them.

23           Well prior to this check sending back period, we had

24   been asking them who's our creditor under Truth in Lending Act

25   1641(g) and asking them some questions.  And then they charged

1    us this extra amount per escrow, and we -- and my husband

2    talked to them multiple times saying --

3            MR. FINDSEN:  Many times they lied.

4            MS. FINDSEN:  -- please tell me who is the investor,

5    and they said we're never going to tell you who the investor

6    is, which violates federal law.  But that's fine.  That's what

7    they said.

8            And so we see this anomaly on our bill, and it was

9    different, and you're right it should have been the same every

10   month, and it was different.  And I contacted them in writing

11   about it, and they didn't give me an accounting of the escrow.

12   And in fact that next check they rejected.  And that's what

13   began this story.  And it's not fun for us either.

14           MR. FINDSEN:  That's when they found, Your Honor, that

15   I asked over and over, as we did in writing, who the creditor

16   was.  When I talked to them, they literally told me:  I'm never

17   telling you.  The management of PNC said we're never to tell

18   people.

19           That's what they told me.  And then when we inquired

20   more through writing, they were -- they would not tell us.  And

21   to this date we know that the timeline for what they're saying

22   is absolutely incorrect.  It's impossible as a matter of fact.

23   They can't -- They assigned -- They assigned the loan, the

24   one --

25           MS. FINDSEN:  The beneficial interest and the deed of

1    trust in 2012 --

2         MR. FINDSEN:  To -- When they say we're in default,

3    they're saying that they put our loan into a REMIC trust when

4    it was in default.  That's an impossibility.  You cannot do

5    that.  You don't have to be a master's in finance to understand

6    that they're lying about that.

7         So we know they're lying about, to this day, the

8    parties, about the timing of it, everything.  They're just -- I

9    mean, most of what he said today was a lie.

10        THE COURT:  Assuming that for the moment, assuming

11   that for the moment, then -- But Tiffany & Bosco, it's just a

12   referral package --

13        MS. FINDSEN:  Which they won't produce our referral

14   package even.  They're claiming it's attorney-client privilege,

15   which is a sword and a shield, Your Honor.  They were acting as

16   a trustee, not an attorney at that point.  A realtor, an escrow

17   agent, and an attorney can act as a trustee.  And as a trustee,

18   we know from Hogan, the Arizona Supreme Court has said they owe

19   us a duty as well as the beneficiary.  It's kind of a neutral,

20   right?  So how can it possibly be that they can withhold our

21   foreclosure referral file from us?

22        THE COURT:  Mr. Maledon, do you want to comment on any

23   of this?

24        MR. MALEDON:  Sure, Your Honor.  First of all, the

25   statements made by Mr. Findsen about all of the things that

1    happened before we got involved are completely irrelevant.  And

2    there's no way that -- there's no way that I can respond to

3    that, Your Honor, because I don't know what conversations they

4    had with PNC before.  What we know is that Tiffany & Bosco

5    received a referral from PNC to proceed with a foreclosure, as

6    typically happens with their clients, be it Bank of America or

7    Wells Fargo or in this case PNC.

8          So, Your Honor, Ms. Findsen is correct that there's a

9    referral package that gets sent.  It gets sent electronically.

10   Much of that we've already provided to them, we've given them,

11   to the extent that it is not protected by the privilege.

12   There's certain portions of it that are not.

13         What we've refused to give them basically is the

14   communication from the client, albeit it's in the form of an

15   electronic communication similar to an e-mail, that basically

16   says here's how we want you to proceed, so on and so forth.

17         We believe that's an attorney-client communication

18   much the same as any client that would call me up and say

19   here's the issue that I have for you, and here's what I want

20   you to do, and here's how I want you to proceed, and here's the

21   advice that I'm looking for.

22         That's essentially the kind of communication that is

23   in this package.  And we think that's protected by the

24   privilege.  That's what we've refused to give them.

25         But we've also told Ms. Findsen that we're happy to

1    sit down and talk about other portions of that file.  She says

2    the whole thing is not privileged.  We disagree with that.  But

3    we're happy to talk about other portions of it that may not be

4    privileged or that may not be subject to the work product

5    doctrine.

6         A lot of it is stuff that was generated internally by

7    Tiffany & Bosco as they started to process the foreclosure

8    proceeding.  So we have the overlay of the attorney-client

9    privilege with the communication coming from the bank, and we

10    have the overlay of the work that was being done internally by

11    Tiffany & Bosco to proceed with the foreclosure proceeding

12    before this lawsuit came about.

13         So that's what we've been dealing with, Your Honor.

14    We'll continue to work with her in an effort to resolve any of

15    those discovery disputes.  But we're not, Your Honor, going to

16    give her the communication that we received from the client or

17    that Tiffany & Bosco received from the client about how they

18    wanted the client to proceed or how they wanted Tiffany & Bosco

19    to proceed.  Excuse me.

20         THE COURT:  Okay.  Thank you.  Okay.  Well, unless

21    there's anything else that anyone wants to bring up right now,

22    Ms. Findsen, you and Mr. Findsen are acting as your own

23    counsel, which you're a licensed attorney.  I come back to the

24    old adage when you're doing that, that creates certain

25    problems, particularly if it gets to the point where you're

1    going to testify, to find a methodology for dealing with that.

2    And it can be done.  We have people represent themselves all

3    the time.  Because there's comments that you make that you are

4    making as the attorney for you and your husband, and then

5    there's comments that you're making as a witness in the case,

6    particularly in your dialog back and forth with counsel.  So

7    that can be problematic; not insurmountable, however.  I just

8    throw that out, once again, for the what-it's-worth category.

9           On the issue of privileges, if it gets that far that

10   we think there's still something in dispute, that I may require

11   briefing on.  But call me first.  And the way we usually handle

12   that is that the documents in question are usually filed in

13   camera with a two-page memoranda, no more, as to why the

14   privilege applies.

15          And then it's easier.  It takes the wear and tear off

16   of everyone, and we have a definitive ruling that the parties

17   can deal with.

18          That's easy.

19          Okay.  We'll try and get a hold of a magistrate judge

20   that's available to do this in the next -- within the next

21   month.  If there's anything else we can help you out with,

22   unless there's anything else we ought to take up right now?

23          Ms. Findsen, Mr. Findsen, anything?

24          MS. FINDSEN:  No, Your Honor.

25          MR. MALEDON:  Nothing, Your Honor.

1          THE COURT:  Thank you.  Well, now, I appreciate

2    everyone being here.  Obviously this case has drawn a lot of

3    battle lines, we're all aware of, that are real hot buttons.

4    But I would caution the parties on a couple things.

5          One, it's going to cost a fortune if you decide to

6    engage experts.

7          Two, in reality what's at stake here.

8          And, three, there's a severability issue that may come

9    up because -- When I say severability, the things that occurred

10   at PNC prior to Tiffany & Bosco becoming involved.  They deal

11   with it when they get here.  They're the only party in here.

12   And I'm not so sure that any testimony relating to PNC would --

13   I don't know this at this point -- would be admissible under

14   some legal theory, setting the stage and telling the complete

15   story.  And it may very well be prejudicial as against these

16   individuals.  But we leave that for another day.

17         So with that in mind, we'll stand at recess, and thank

18   you all very much.

19         And we'll see maybe you can find a solution to the

20   case.  Thank you.

21       (Proceedings recessed at 3:14 p.m.)

22

23

24

25

**UNITED STATES DISTRICT COURT**

1

**C E R T I F I C A T E**

2

3          I, LINDA SCHROEDER, do hereby certify that I am duly

4     appointed and qualified to act as Official Court Reporter for

5     the United States District Court for the District of Arizona.

6          I FURTHER CERTIFY that the foregoing pages constitute

7     a full, true, and accurate transcript of all of that portion of

8     the proceedings contained herein, had in the above-entitled

9     cause on the date specified therein, and that said transcript

10    was prepared under my direction and control.

11         DATED at Phoenix, Arizona, this 30th day of September,

12    2013.

13

14                                   s/Linda Schroeder
                                Linda Schroeder, RDR, CRR
15

16

17

18

19

20

21

22

23

24

25